THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
DANIEL A. SAUNDERS (Cal. Bar #161051)
daniel.saunders@usdoj.gov
KEVIN M. LALLY (Cal. Bar #226402)
kevin.lally@usdoj.gov
Assistant United States Attorneys
Violent & Organized Crime Section
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-2272/2170
Facsimile: (213) 894-3713

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 05-1046(E)-DSF |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S POSITION RE: SENTENCING FOR DEFENDANT TERRY CHRISTENSEN AND RESPONSE TO DEFENDANT'S SENTENCING POSITION |
| v. | ) | |
| ANTHONY PELLICANO, et al., | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, United States of America, by and through its counsel of record, Assistant United States Attorneys Daniel A. Saunders and Kevin M. Lally, hereby submits its sentencing position for defendant Terry Christensen and response to defendant's sentencing position in the above-captioned case.

The government's sentencing position and response is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Report, and such

1  additional evidence or argument as may be presented at the

2  sentencing hearing.

3  DATE: November 10, 2008          Respectfully submitted,

4                                   THOMAS P. O'BRIEN
                                     United States Attorney

5

6                                   CHRISTINE C. EWELL

7                                   Assistant United States Attorney
                                     Chief, Criminal Division

8

9

10                                  DANIEL A. SAUNDERS
                                     KEVIN M. LALLY

11                                  Assistant United States Attorneys

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

TABLE OF CONTENTS

DESCRIPTION                                                    PAGE(S)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .  ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . .  1

II.   GUIDELINE CALCULATIONS . . . . . . . . . . . . . . .  3

      A.    A THREE-LEVEL ENHANCEMENT SHOULD BE IMPOSED
            UNDER USSG § 2H3.1(b)(1)(B) BECAUSE THE PURPOSE
            OF THE OFFENSE WAS TO OBTAIN DIRECT OR INDIRECT
            ECONOMIC GAIN . . . . . . . . . . . . . . . . .  3

      B.    A TWO-LEVEL ENHANCEMENT SHOULD BE IMPOSED UNDER
            USSG § 3B1.1(c) BASED ON DEFENDANT'S SUPERVISION OF
            PELLICANO IN THE CRIMINAL ACTIVITY . . . . . . .  6

      C.    A TWO-LEVEL ENHANCEMENT SHOULD BE IMPOSED UNDER
            USSG § 3B1.3 FOR ABUSE OF A POSITION OF TRUST . . .  11

      D.    AN UPWARD DEPARTURE OF NO LESS THAN THREE LEVELS
            SHOULD BE IMPOSED TO ACCOUNT FOR THE MASSIVE INVASION
            OF PRIVACY CAUSED BY DEFENDANT'S ILLEGAL WIRETAP AND
            HIS USE OF THE WIRETAP TO INTERCEPT PRIVILEGED
            COMMUNICATIONS AND SUBVERT THE JUDICIAL PROCESS . .  14

            1.    An Upward Departure is Warranted to
                  Address Defendant's Violations of the
                  Attorney-Client Privilege and His Use of
                  the Wiretap to Gain an Unfair Tactical
                  Advantage in Litigation . . . . . . . . .  15

            2.    An Upward Departure is Warranted to
                  Address the Duration of the Illegal
                  Wiretap and the Number of Intercepted
                  Conversations . . . . . . . . . . . . . .  16

            3.    An Upward Departure is Warranted to Address
                  the Substantial Non-Monetary Harm Caused By
                  Defendant's Criminal Acts . . . . . . . .  17

      E.    THE GOVERNMENT'S GUIDELINE CALCULATION . . . . .  20

III.  RESPONSE TO PROBATION OFFICER'S SENTENCING
      RECOMMENDATION . . . . . . . . . . . . . . . . . . .  21

IV.   RECOMMENDED SENTENCE . . . . . . . . . . . . . . . .  26

      A.    A 36-Month Sentence is Appropriate . . . . . . .  26

            1.    Nature and Circumstances of the Offense . . .  28

            2.    History And Characteristics Of The Defendant .  28

TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                          PAGE(S)

       3.   Need For The Sentence to Reflect the
           Seriousness of the Offense, to Promote
           Respect For the Law, and to Provide Just
           Punishment For the Offense  . . . . . . . .   30

       4.   Need For the Sentence to Afford Adequate
           Deterrence . . . . . . . . . . . . . . . .   30

       5.   Need For the Sentence to Protect the Public  .   32

   B.   A $500,000 Fine Should Be Imposed . . . . . . . .   33

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . .   35

TABLE OF AUTHORITIES

FEDERAL CASES                                              PAGE(S)

Irizarry v. United States,
     128 S. Ct. 2198 (2008) . . . . . . . . . . . . . . .   15

Schachter v. C.I.R.,
     255 F.3d 1031 (9th Cir. 2001) . . . . . . . . . . .   33

United States v. Bergman,
     416 F. Supp. 496 (S.D.N.Y. 1976) . . . . . . . . . .  23

United States v.  Booker,
     543 U.S. 220 (2005)  . . . . . . . . . . . . 15, 25, 26

United States v. Cantrell,
     433 F.3d 1269 (9th Cir. 2006) . . . . . . . . . . .   27

United States v. Evans-Martinez,
     530 F.3d 1164 (9th Cir. 2008) . . . . . . . . . . .   15

United States v. Franklin,
     837 F. Supp. 916 (N.D. Ill. 1993) . . . . . . . . .   14

United States v. Goldman,
     447 F.3d 1094 (8th Cir. 2006) . . . . . . . . . . .   12

United States v. Harrington,
     114 F.3d 517 (5th Cir. 1997) . . . . . . . . . . . .  12

United States v. Hemmingson,
     157 F.3d 347 (5th Cir. 1998) . . . . . . . . . . . .  12

United States v. Hugh,
     533 F.3d 910 (8th Cir. 2008) . . . . . . . . . . . .   5

United States v. Mondello,
     927 F.2d 1463 (9th Cir. 1991) . . . . . . . . . . .   25


FEDERAL STATUTES

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . .    27

Fed. R. Crim. P. 32(h) . . . . . . . . . . . . . . . .    15


FEDERAL SENTENCING GUIDELINES

USSG § 1B1.1(a) . . . . . . . . . . . . . . . . . . . .    5

USSG § 2H3.1 . . . . . . . . . . . . . . . . . . . . .    17

TABLE OF AUTHORITIES (CONTINUED)

FEDERAL SENTENCING GUIDELINES                                    PAGE(S)

USSG § 2H3.1(b)(1)(B) . . . . . . . . . . . . . . . . 3

USSG § 2H3.1, comment. (n.3) . . . . . . . . . . . 15, 17

USSG § 3B1.1(c) . . . . . . . . . . . . . . . . . . . 6

USSG § 3B1.3 . . . . . . . . . . . . . . . . . . . . 11

USSG § 5E1.2(d) . . . . . . . . . . . . . . . . . . 33

USSG § 5H1.6 . . . . . . . . . . . . . . . . . . . . 25

USSG § 5K2.0(a)(1) . . . . . . . . . . . . . . . . . 14

USSG § 5K2.0(a)(3) . . . . . . . . . . . . . . . . . 16

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

On February 15, 2006, a grand jury returned an indictment charging Terry Christensen ("defendant"), a nationally prominent attorney and the founder of a major law firm in Los Angeles, with conduct that appeared unthinkable to the legal community and to the public at large:  the illegal wiretapping of an opposing party's privileged attorney-client telephone conversations in order to secure a tactical advantage in litigation.  Over the course of the following two-and-a-half years, defendant mounted a scorched-earth challenge to the government's prosecution, seeking through a series of meritless motions and appeals to prevent the truth about his conduct from ever coming to light, and engaging in a public campaign of vilification against the government and against his own victim to divert attention away from the charges against him.  On August 29, 2008, having heard all the evidence during a five-week trial, a jury of defendant's peers placed the blame for his reprehensible criminal conduct where it belongs - squarely on his own shoulders.

The evidence at trial proved:  that defendant, a sworn officer of the Court, knowingly conspired with convicted private investigator Anthony Pellicano to wiretap the home telephones of Lisa Bonder Kerkorian in connection with her child support case against defendant's client, billionaire Kirk Kerkorian; that Pellicano, over a two-month period, provided defendant with information he was learning from the wiretap regarding the paternity of Bonder Kerkorian's daughter, which defendant viewed

as a significant issue in the ongoing litigation; that Pellicano
also provided defendant with Bonder Kerkorian's litigation
strategy, her settlement position, and the details of her most
private and intimate telephone conversations with her attorneys,
her family and her friends; that defendant directed Pellicano on
how long to keep the wiretap going, specifically ordering him at
one point to leave it up one more day so that defendant could
learn what Bonder Kerkorian's lawyers told her about a court
hearing; and that defendant found enjoyment in his crimes,
brazenly and gleefully laughing on numerous occasions about his
cleverness in perverting and debasing the judicial system he had
sworn to uphold.  Numerous attorneys, including victims of
defendant's wiretapping, testified about the importance of the
attorney-client privilege to a fair litigative process and their
shock that any attorney could be so thoroughly corrupt as to
wiretap the private communications of opposing counsel.  To date,
defendant has yet to express one iota of regret, remorse or
acceptance of responsibility for his contemptible criminal acts.
Indeed, defendant's sentencing memorandum simply continues his
dishonorable practice of trashing his victim, and further objects
to the Probation Officer's suggestion of any defense
acknowledgment that wiretapping in fact occurred.

     For this, defendant asserts that a sentence of probation is
appropriate.  The government emphatically disagrees.

     The government concurs with the Probation Officer's
calculation of the base offense level and the application of a
three-level enhancement for economic gain.  In addition, the
government submits that a two-level role enhancement is warranted

based on defendant's supervision of Pellicano in connection with the wiretap, and that a further two-level enhancement is appropriate for abuse of a position of trust.  Finally, the government submits that an upward departure of no less than three levels is appropriate in this case to account for aggravating circumstances that are nowhere reflected in the guideline calculation, including the duration of the wiretap, the massive resulting invasion of privacy, and the fact that defendant used it to subvert and undermine the judicial process.

Thus, the government submits that the correct total offense level is 19, with an advisory guideline range of 30-37 months. The government recommends a guideline sentence of 36 months imprisonment, which it submits is the minimum sentence necessary to provide appropriate general and specific deterrence, to promote respect for the law, to provide just punishment, and to reflect the seriousness of defendant's crimes.  The government also recommends the imposition of the statutory maximum fine of $500,000.

## II.

### GUIDELINE CALCULATIONS

A.   A THREE-LEVEL ENHANCEMENT SHOULD BE IMPOSED UNDER USSG
     § 2H3.1(b)(1)(B) BECAUSE THE PURPOSE OF THE OFFENSE WAS TO
     OBTAIN DIRECT OR INDIRECT ECONOMIC GAIN

USSG § 2H3.1(b)(1)(B) provides for a three-level enhancement if "the purpose of the offense was to obtain direct or indirect commercial advantage or economic gain."  The Probation Officer recommends that this enhancement be implied because the information obtained from the wiretaps was used to secure a tactical advantage in litigation, which constitutes indirect

1  economic gain.  (PSR ¶ 25).  Defendant contests the application

2  of the enhancement, claiming that he hired Pellicano solely to

3  determine Kira Kerkorian's paternity.  (Defendant's Position at

4  3-7).  The evidence presented at trial supports the enhancement.

5      Even accepting that defendant's primary purpose in hiring

6  Pellicano to implement an illegal wiretap was to identify Kira

7  Kerkorian's biological father, the evidence established that such

8  a goal was not inconsistent with economic gain.  Several

9  witnesses testified that Kirk Kerkorian's legal team repeatedly

10 sought to inject the paternity issue into the court proceedings,

11 even after Judge Edmon had precluded further discovery on the

12 issue in March 2002, for the purpose of challenging Bonder

13 Kerkorian's credibility and thereby defeating her order to show

14 cause for increased child support.  Defendant's suggestion that

15 the paternity issue was wholly separate and apart from the high

16 economic stakes in the litigation is not borne out by the

17 evidence.

18     Moreover, the evidence demonstrated beyond any dispute that

19 Pellicano repeatedly provided defendant with information obtained

20 from the illegal wiretap that had nothing to do with paternity,

21 but related directly to the ongoing litigation.  Defendant

22 understood and agreed from the outset that this would be the

23 case.  See Trial Exh. 1A at 6-7 (AP: "Now, in the meantime I'm

24 gonna prov, be providing you with other information that may help

25 you in this case."  TC: "I'll take it.  I'm a good sport that

26 way.").  The recordings are replete with Pellicano's disclosures

27 of Bonder Kerkorian's settlement position, deposition strategy,

28 contemplated motions, and other subjects of her intercepted

attorney-client communications, and include his statement that
"if we continue to, to, to get this kind of information with
their strategy, we're, we're really killing them."  (Exh. 5A at
15).  Defendant never declined any of this information or said
that he wasn't interested:  to the contrary, he acknowledged to
Pellicano that this "other stuff" was "very helpful" to him.
(Trial Exh. 14A at 8).  Indeed, when defendant directed Pellicano
on May 14, 2002 to leave the wiretap up for one more day, it was
not to obtain any information regarding paternity, but rather
because he thought it would be "interesting" to know what Bonder
Kerkorian's attorneys told her about a court hearing that day.
Thus, the evidence shows that the purpose of the wiretap was in
fact to gain inside information that could be used to defendant's
advantage in the litigation, thereby obtaining economic gain.  It
does not matter for purposes of this enhancement whether any
economic gain was in fact achieved.  See United States v. Hugh,
533 F.3d 910, 912 (8th Cir. 2008) (enhancement under
§ 2H3.1(b)(1) does not require that the defendant actually
benefit financially, but only that the "purpose" of the offense
was economic gain).

     The economic gain enhancement applies for an additional
reason wholly separate and apart from defendant's use of the
wiretap to secure a litigative advantage.  USSG § 1B1.1(a)
provides that, "in the case of a jointly undertaken criminal
activity," all specific offense characteristics shall be
determined on the basis of "all reasonably foreseeable acts and
omissions of others in furtherance of the jointly undertaken
criminal activity."  Here, regardless of whether defendant

1  undertook the wiretapping for financial gain, it is undisputable

2  that he was aware that Pellicano did so.  The wiretap in this

3  case was a commercial for-profit enterprise, paid for by

4  defendant with promises of substantial "bonuses" depending on

5  what information Pellicano could obtain.  Because the actions of

6  defendant's co-conspirator in perpetrating the wiretap for

7  financial gain were reasonably foreseeable and were in

8  furtherance of the jointly undertaken criminal activity, § 1B1.3

9  requires that Pellicano's profit motive be imputed to defendant

10  and that the enhancement under § 2H3.1(b)(1) be applied.

11  B.   A TWO-LEVEL ENHANCEMENT SHOULD BE IMPOSED UNDER USSG
         § 3B1.1(c) BASED ON DEFENDANT'S SUPERVISION OF PELLICANO IN
12       THE CRIMINAL ACTIVITY

13       USSG § 3B1.1 provides for a range of enhancements to the

14  offense level for defendants who play an aggravating role in the

15  offense.  Section 3B1.1(c) imposes a two-level enhancement if the

16  defendant was an organizer, leader, manager or supervisor in any

17  criminal activity that did not involve five or more participants

18  or was not otherwise extensive.  The Probation Officer's

19  conclusion that "[t]here is no evidence that Christensen managed

20  or led any of the other participants" (PSR ¶ 28) simply ignores

21  voluminous evidence that defendant managed and supervised

22  Pellicano in connection with the offense conduct.[1]

23       The recordings in this case provide numerous examples of the

24  hierarchical relationship of the conspiracy, in which defendant

25  directed Pellicano in the wiretap-related activities, determined

26

27  _____

28       [1]   Although the government provided the Probation Officer
    with transcripts of the 34 recordings of defendant's
    conversations with Pellicano, they are not discussed anywhere in
    the presentence report or recommendation.

                                    6

1   how much Pellicano would be paid, and made decisions as to how

2   long the criminal activity should continue.   Those examples

3   include, but are not limited to, the following:

                                    ***

5       AP:   But Terry, you know you and I have never...I, I have
              never had the honor of working directly for you before.

6       TC:   That's right, you haven't.

7   (Exh. 1A at 2).
                                    ***

9       AP:   I'm just giving you information. I work for you, you
              don't-

10      TC:   I know.

11      AP:   -work for me.

12      TC:   I know.

13  (Exh. 4A at 14).

                                    ***

15      AP:   Well, you know, listen, you're, you're the boss, you do
16            what ever you want to do.

17  (Exh. 13A at 6).

18                                  ***

19      AP:   Right.  You do, listen, you're the boss, you do what
              you wanna do-

20      TC:   I know that.

21  (Exh. 17A at 6).

22                                  ***

23
        AP:   I wanna tell you, if I haven't proven my value to
24            you...

25      TC:   You, you're gonna be my number one guy.

26      AP:   If I haven't proven my value to you by this time, then
              I'm doing something real wrong.

27
        TC:   (laughing)

28

                                    7

1      AP:  Then, then, then I might as well just hang up, you
               know, and go and ah, and ah, become a monk.

2

      TC:  Alright.  Well you gotta, there's one more, you, you,
3           you got your assignments, okay?

4      AP:  Yeah.

5  (Exh. 19A at 3-4).

6                    ***

7      AP:  I don't know, you know, the, the all-encompassing plan.
               I'm just a soldier.

8

      TC:  Yeah.
9

      AP:  You understand?  You know, there, there, there, you
10         know, when you decide to let me know what the all-
               encompassing plan is, you'll let me know.  But in the
11         meantime, I've got to fight the battle that you're
               asking me to fight.  Right?

12

      TC:  Yep.
13

      AP:  Okay.  Does that make sense to you?
14

      TC:  Absolutely.
15

      AP:  Alright.  So I'm gonna continue to fight the battle
16         that you asked me fight and if you want me to get into
               even a full-scale war I'll do that.

17

  (Exh. 28A at 6).
18

                    ***
19

      AP:  Yeah, but you haven't given me a decision yet, pal.
20

      TC:  On what?  Decision on what?
21

      AP:  Ah, the, the continuation.
22

      TC:  (sigh) You know I was thinking about maybe we'd knock
23         it off for a while and then see what happened when we
               came back.  Does that make sense?  Or does, does that
24         not work?

25      AP:  Ah...

26      TC:  You're constantly having to do this and dig this and
               chase this UNT you, you know, I wanna let you off that
27         hook.

28      AP:  How you gonna do that?  I either stop or I don't.

1     TC:   UNT.

2     AP:   That doesn't mean that I have to report to you.  Unless
            there's something interesting.

3

4     TC:   Yeah, but I don't want you to have to work this hard on
            this.

5     AP:   Well what do you, what, you're the boss.  Tell me what
            you want me to do. I'm a, I'm a...

6

7     TC:   Well there's gonna be...

8     AP:   I'm a sol- I'm a soldier.  I told you that.  Tell me
            what you want me to do.

9     (Exh. 28A at 9).

10                              ***

11    TC:   So you know, I guess it would be interesting to know
            what they told her today.

12

13    AP:   Right, okay.

14    TC:   And then tomorrow there'll be nothing and, okay.  Let's
            do this.  Let's find out what they told her, what went
            on today.

15

16    AP:   Okay.

17    TC:   Tomorrow let's plan to do nothing, and tomorrow we will
            decide if we keep going.

18    AP:   Okay.

19    (Exh. 28A at 10).

20                              ***

21    AP:   But, but you know, I'm, I'm with you.  My loyalty is
            with you.  You asked me to do something.  I did it.

22

23    (Exh. 29A at 3).

24                              ***

25    AP:   Do I continue or not?

26    TC:   Um.  Let's um, let's end it, um, I'm getting on a plane
            tomorrow.

27    (Exh. 29A at 20-21).

28                              ***

                                9

```
 1    TC:  So we're done.  Let's just say that tonight is the end
           of it.
 2
      AP:  Okay.
 3
      TC:  And even then, don't report to me unless you have to,
 4         until the morning.  You know what I mean?

 5    AP:  Alright, I won't report to you at all.

 6    TC:  No, no, but let's, let's just finish, do today, let's
           see what happens today and then tomorrow morning we'll
 7         wra- that'll be the wrap-up.

 8  (Exh. 29A at 21).

 9                              ***

10    AP:  I'm just trying to be a, I'm just trying to be a good
           soldier.
11
    (Exh. 33A at 9).
12
                                ***
13
      TC:  We'll stay with it.
14
      AP:  We're, we're gonna what?
15
      TC:  We'll stay with the decision.
16
      AP:  The decision, good.
17
      TC:  Yeah.
18
      AP:  Thank you very kindly.
19
      TC:  Stay with the decision.
20
      AP:  Whew! Okay. Now, is there anything more you want me to
21         do?

22  (Exh. 33A at 10).

23                              ***

24    AP:  I have to, I have to have an adventure tonight, right?

25    TC:  Yeah.

26    AP:  Okay, I was trying to get out of that.

27    TC:  No, one more.

28    AP:  (laughs).
```

TC:   One more adventure.

(Exh. 33A at 19-20).

                              ***

AP:   Well, I just hope that I've proved my loyalty to you.
      And, and I also, that you see the kind of soldier I am.
      I hope that that's all come forward.

TC:   It sure has.

(Exh. 33A at 20).

                              ***

    In light of the above evidence, and other evidence
introduced at trial, that defendant was the "shot-caller" with
respect to the wiretapping conspiracy and exercised supervisory
decision-making authority over Pellicano, the government submits
that a two-level enhancement is appropriate under USSG
§ 3B1.1(c).[2]

C.   A TWO-LEVEL ENHANCEMENT SHOULD BE IMPOSED UNDER USSG § 3B1.3
     FOR ABUSE OF A POSITION OF TRUST

    Section 3B1.3 of the Sentencing Guidelines provides for a
two-level enhancement "[i]f the defendant abused a position of
public or private trust, or used a special skill, in a manner
that significantly facilitated the commission or concealment of
the offense."[3]   USSG § 3B1.3.   The guidelines contemplate that

---

    [2]    It is likely that the wiretapping in this case included
the participation of numerous other individuals acting at
Pellicano's direction (and therefore under defendant's indirect
supervision), including Ray Turner, Kevin Kachikian, Joann
Wiggan, and/or other telephone company employees.   However,
because the government cannot identify with certainty the
individuals involved in this particular wiretap, the government
does not advocate for a three- or four-level role enhancement
under USSG § 3B1.1(a) or (b).

    [3]    The Presentence Report considers and rejects use of a
special skill as the basis for an enhancement, but wholly
neglects to discuss the alternative abuse of trust ground

                              11

1  individuals who abuse their positions of trust to facilitate the

2  commission or concealment of a crime "generally are viewed as

3  more culpable." Id., comment. (backg'd.).

4      Here, defendant held a position of public trust as a member

5  of the California State Bar and an officer of the Court. See

6  United States v. Goldman, 447 F.3d 1094, 1095 (8th Cir. 2006) ("A

7  defendant acting in his capacity as an attorney occupies a

8  position of public trust."); United States v. Hemmingson, 157

9  F.3d 347, 360 (5th Cir. 1998) ("[A]ttorneys by definition occupy

10  a position of public trust."); United States v. Harrington, 114

11  F.3d 517, 519 (5th Cir. 1997) ("[I]t cannot be gainsaid that

12  lawyers occupy a position of public trust. It would be rank

13  folly to suggest otherwise."). The only issue, therefore, is

14  whether defendant abused that position in a manner that

15  significantly facilitated either the commission or the

16  concealment of his offense. The government respectfully submits

17  that both are satisfied here.

18      This is not a case of a defendant who committed a crime and

19  who coincidentally happened to be an attorney. To the contrary,

20  this case involves a defendant whose criminal activities were

21  directly intertwined with and inextricable from his work as an

22  attorney. It was in defendant's capacity as an attorney that he

23  hired Pellicano to investigate and to wiretap Lisa Bonder

24  Kerkorian, and it was only by virtue of his role as counsel for

25  the opposing party that he knew what information was important,

26  what to instruct Pellicano to listen for (such as when he

27  directed Pellicano to keep the wiretap going for one more day to

28  _____

contained in the same guideline section. (PSR ¶ 28).

find out what Bonder Kerkorian's counsel told her about a court
hearing that defendant had attended), and how to put the
information obtained from the wiretap, including Bonder
Kerkorian's litigation strategy and communications with her own
counsel, to the most effective use in the litigation.  Thus,
defendant's position of trust not only "significantly
facilitated" the commission of his offense:  the offense would
never have occurred but for that position.

Moreover, even without knowing that Pellicano was recording
their conversations, defendant was undoubtedly emboldened in his
criminal dealings with Pellicano by the belief that he could
protect those communications from disclosure by invoking the
attorney-client privilege.  Of course, that is precisely what in
fact happened, as defendant persisted throughout this case in
asserting that privilege (which protects only legitimate and
lawful communications of legal advice between attorney and
client) in an effort to keep the evidence of his crimes from ever
coming to light.  The government submits that a corrupt attorney
who seeks to hide his offenses through knowingly frivolous and
untenable claims of attorney-client privilege - claims that he is
only entitled to raise by virtue of his status as an attorney -
abuses his position of trust in a manner that significantly
facilitates the concealment of his criminal activities.

An attorney holds a position of trust in the community, and
an attorney who abuses that position to further a criminal
conspiracy is viewed under the Guidelines as more culpable than
an individual who does not hold such a position.  Because
defendant's status as an attorney was integral to his ability to

1  commit and to conceal his criminal conduct, the two-level

2  adjustment under § 3B1.3 is warranted.  See United States v.

3  Franklin, 837 F. Supp. 916, 920 (N.D. Ill. 1993) ("By conspiring

4  to obstruct the very judicial process that he had sworn to

5  defend, [the attorney-defendant] abused his position of public

6  trust . . . .").

7  D.   AN UPWARD DEPARTURE OF NO LESS THAN THREE LEVELS SHOULD BE
        IMPOSED TO ACCOUNT FOR THE MASSIVE INVASION OF PRIVACY

8       CAUSED BY DEFENDANT'S ILLEGAL WIRETAP AND HIS USE OF THE
        WIRETAP TO INTERCEPT PRIVILEGED COMMUNICATIONS AND SUBVERT

9       THE JUDICIAL PROCESS

10      The Sentencing Guidelines provide for upward departures from

11 the applicable guideline range where "there exists an aggravating

12 or mitigating circumstance . . . of a kind, or to a degree, not

13 adequately taken into consideration by the Sentencing Commission

14 in formulating the guidelines that, in order to advance the

15 objectives set forth in 18 U.S.C. § 3553(a)(2), should result in

16 a sentence different from that described."  USSG § 5K2.0(a)(1).

17      The Probation Officer states that she "has not identified

18 any factors that would warrant a recommendation for a departure

19 from the advisory guideline range."  (PSR ¶ 104).  The government

20 submits that this statement demonstrates the Probation Officer's

21 unfamiliarity with - or lack of understanding of - the

22 uniqueness, severity, and profound offensiveness of defendant's

23 criminal conduct, including his brazen efforts to corrupt and

24 subvert the legal system.  The Probation Officer's finding also

25 ignores a directly applicable Application Note to the wiretapping

26 guideline, which provides that an upward departure may be

27 warranted if the offense "caused or risked substantial non-

28 monetary harm" (including "a substantial invasion of privacy

14

interest"). USSG § 2H3.1, comment. (n.3). The government submits that the unique circumstances of this case include a number of aggravating factors that are not addressed by the guidelines and that, individually or in combination, warrant an upward departure of no less than three levels.[4]

    1.   <u>An Upward Departure is Warranted to Address Defendant's Violations of the Attorney-Client Privilege and His Use of the Wiretap to Gain an Unfair Tactical Advantage in Litigation</u>

Defendant's conduct in this case, and his unhesitating willingness to invade the most sacrosanct of privileges, demonstrated an utter contempt for the judicial process itself. Defendant routinely walked into court and appeared before the judge in the <u>Kerkorian v. Kerkorian</u> matter, never disclosing that he knew exactly what the other side was going to do in advance because his private investigator had been wiretapping and listening to the privileged conversations between opposing counsel and their client. Defendant's cheating subverted the legal system and violated fundamental principles of fairness and equal treatment under the law. As Harlee Gasmer testified at trial, "the attorney-client privilege is something that we're all taught to keep sacred, and the idea that our calls were being listened in and the contents of the conversations with my client were being given to the other side to gain an advantage in this

---

    [4]    Should the Court contemplate the imposition of a departure on a ground not identified herein, advance notice to the parties is required. <u>United States v. Evans-Martinez</u>, 530 F.3d 1164, 1167-68 (9th Cir. 2008); Fed. R. Crim. P. 32(h). Such notice is not required for <u>Booker</u> variances from the advisory guideline range. <u>Irizarry v. United States</u>, 128 S. Ct. 2198, 2203-04 (2008); <u>Evans-Martinez</u>, 530 F.3d at 1169.

litigation was just shocking.  Absolutely shocking." (8/15/08
(P.M.) RT 52).

The offense level under the wiretapping guideline is the
same regardless of the nature of the intercepted communication.
Thus, the Guidelines wholly fail to account for the interception
of privileged communications or for the use of wiretaps to
subvert the legal system and achieve an unfair advantage in
litigation.  Indeed, the government submits that defendant's acts
were so base and corrupt that even the Sentencing Commission
could not have contemplated that a case like this would ever
arise.  An upward departure is necessary to reflect the greater
severity and harm to the legal process inherent in the
interception of attorney-client privileged communications.[5]

   2.   An Upward Departure is Warranted to Address the
        Duration of the Illegal Wiretap and the Number of
        Intercepted Conversations

Based on Pellicano's recorded statements, as well as trial
testimony about Lisa Bonder Kerkorian's telephone habits, it is
reasonable to infer that several thousand phone calls were
intercepted by defendant's illegal wiretap.  (See, e.g., Exh. 14A
at 8-9 ("AP: Give me about ah, there's ah fuck, eighty....
Eighty, eighty just from today."); Exh. 22A at 9 ("[T]here's

---

[5]    The government submits that this departure ground is
not duplicative of the requested abuse of trust enhancement,
which focuses on defendant's status as an attorney rather than
the nature of the intercepted communications.  To the extent that
the Court finds any overlap between the two issues, the
government submits that the interception of privileged
communications renders defendant's abuse of trust substantially
in excess of that contemplated by the two-level enhancement in
§ 3B1.3.  See USSG § 5K2.0(a)(3) (upward departure warranted
based on circumstance taken into consideration in determining
guideline range, if court determines that such circumstance is
present in the offense to a degree substantially in excess of
that which ordinarily is involved in that kind of offense).

16

three hundred, another three hundred and sixty-four that I have
to go through.").[6]  The offense level for wiretapping, however,
is the same as if a single call had been intercepted.  See USSG
§ 2H3.1.  Thus, the guidelines wholly fail to account for the far
greater invasion of privacy, and the far greater number of
victims, resulting from defendant's two-month wiretap of Lisa
Bonder Kerkorian.  An upward departure is necessary to account
for this significantly aggravating factor.

   3.   An Upward Departure is Warranted to Address the
        Substantial Non-Monetary Harm Caused By Defendant's
        Criminal Acts

   The application notes to § 2H3.1 specifically contemplate
that "[t]here may be cases in which the offense level determined
under this guideline substantially understates the seriousness of
the offense.  In such a case, an upward departure may be
warranted."  USSG § 2H3.1, comment. (n.3).  As an example, the
commentary mentions cases in which "[t]he offense caused or
risked substantial non-monetary harm (e.g., physical harm,
psychological harm, or severe emotional trauma, or resulted in a
substantial invasion of privacy interest) to individuals whose
private or protected information was obtained."  Id.

   Several of defendant's victims testified or have written
letters to the Court (previously filed under separate cover)
about the significant emotional pain and profound deprivation of

---

   [6]   See also 8/5/08 (A.M.) RT 33 (Nancy Wolff Gossett's
testimony that Bonder Kerkorian called her "very often" and that
"It seemed like every time I hung up the phone, she would call
back."); 8/5/08 (P.M.) RT 68 (Deborah Simon's testimony that
Bonder Kerkorian called her "many, many times a day"); 8/7/08
(P.M.) RT 89 (Jeff Sturman's testimony that he spoke to Bonder
Kerkorian "two, three, or four times per day"); 8/14/08 (P.M.) RT
138 (Harlee Gasmer's testimony that she spoke to Bonder Kerkorian
"several times a day").

privacy that they experienced.  Lisa Bonder Kerkorian, whose

every private, personal and intimate telephone conversation over

the course of two months was intercepted by defendant and

Pellicano, has written about the lasting effects of their crimes,

which have left her "permanently scarred and scared":

> As a result of [Pellicano's] conduct, I and my
> daughter have been exposed to public ridicule and
> suffered financially.  Relationships with my immediate
> family and trusted friends have been seriously and
> permanently damaged.  Our privacy has been destroyed.
> Intimate facts of our lives have been made public.  We
> were forced to move to get away from all of this; my
> daughter left her home, school and has been stripped of
> the emotional stability she once enjoyed.  It has left
> my daughter confused and unable to forge proper close
> bonds to friends, relatives, and male role-models.  She
> has faced cruel comments, sly whispers, and been openly
> ridiculed by students and parents at her school.

> As a result of the criminal conduct I have an
> inability to "trust" anyone.  I don't have the words to
> adequately describe the fear, the pain, and the chaos
> that their actions have inflicted upon us.  I now watch
> through my car window to see if we are being followed.
> I call my phone-service provider to see if someone's
> "listening in to my lines."  I have the sense that we
> are being "stalked" all of the time. . . .  Pellicano,
> Christensen and the other criminals have created the
> "prison" that my daughter and I will be living in for
> the rest of our lives.  The damage done to us and our
> future is incalculable, both on a financial and
> emotional basis.

The individuals who were on the other end of Bonder

Kerkorian's telephone calls have expressed similar feelings of

victimization, psychological harm, and massive invasion of

privacy:

• Harlee Gasmer, who testified at trial that she was

"shocked," "upset," "distressed," and "blown away" upon hearing

Pellicano relay to defendant the substance of her privileged

conversations with her client (8/15/08 (A.M.) RT 52), writes that

defendant's acts have left her feeling "extremely upset" and "violated."

• Nancy Wolff Gossett writes about the "emotional damage" and "devastat[ion]" that she has suffered from learning that others were listening in on her personal conversations, including "information about [her] life, marriage, daughter, work relationships and a myriad of other topics that were very private and sensitive."

• Anetta Herringshaw writes that she was "shocked" and "appall[ed]" to learn of the interception of her private conversations, which she found to be "an insult to the very integrity which I have always stood for."

• Stephen Kolodny describes the "frustration and stress" caused to him by defendant's "dirty trick," and notes the "shame and embarrassment" caused to Lisa Bonder Kerkorian that "will haunt her for the rest of her life."

• Robert Rein writes that he felt "extremely violated" upon learning that his phone conversations were wiretapped and that the effects of defendant's crimes are ongoing: "The effects of the wiretapping are continual. I find myself much more guarded in my discussions on the telephone with clients. I constantly wonder and worry whether this situation could happen again. In essence, I have lost a little bit of my freedom to communicate freely with my clients."

• Deborah Simon explains: "People who have had their homes broken into describe that it's not so much what was taken that is bothersome but the creepy feelings of personal violation that don't go away. Having listened to hours of audio recordings

containing the voices of the defendants describing my personal conversations about myself, my daughter, my life and my relationships with others has left me feeling much the same way. . . . And my anxiety about 'who else might be listening' in conversations with clients is ever present."

- Jeff Sturman writes about his feelings upon learning he was a wiretapping victim: "I was taken aback and extremely offended because I openly communicated my thoughts about Ms. Bonder Kerkorian's case with her, and it is an incredibly violative feeling to know that my supposedly private communications with a client were being listened to so that Mr. Christensen and Mr. Pellicano could use that information against Ms. Bonder Kerkorian, against Mr. Kolodny, and against me."

Thus, defendant's victims have experienced a profound sense of violation, humiliation, and emotional harm resulting from defendant's egregious conduct, as well as an ongoing inability to trust in the confidentiality of their telephone conversations (which, for attorneys, directly impacts their ability to practice their profession).  The government submits that this is precisely the type of "substantial non-monetary harm" contemplated by the commentary to § 2H3.1 as the basis for an upward departure.

E.   THE GOVERNMENT'S GUIDELINE CALCULATION

In light of the foregoing, the government submits that the following guideline calculation applies:

| | | |
|---|---|---|
| Base Offense Level: | 9 | [USSG § 2H3.1(a)(1)] |
| Economic Gain: | +3 | [USSG § 2H3.1(b)(1)(B)] |
| Aggravating Role: | +2 | [USSG § 3B1.1(c)] |
| Abuse of Trust: | +2 | [USSG § 3B1.3] |

1  Upward Departure:          +3[7]   [USSG § 5K2.0]

2  Total Offense Level:        19

3  With a criminal history category of I, a total offense level of

4  19 yields an advisory sentencing range of 30-37 months.

5                                III.

6      RESPONSE TO PROBATION OFFICER'S SENTENCING RECOMMENDATION

7          Even without imposing what the government views as plainly

8  applicable enhancements or considering departure grounds spelled

9  out in the wiretapping guideline itself, the Probation Officer

10 has calculated an advisory sentencing range of 10-16 months.  The

11 Probation Officer, however, has recommended a sentence of

12 probation, to include 10 months of home detention in defendant's

13 multi-million-dollar Beverly Hills mansion.[8]  Not surprisingly,

14 defendant concurs with this recommendation.

15     In support of her recommendation, the Probation Officer

16 relies in part on "the significant collateral consequences" of

17 defendant's conviction, including his bar suspension and "the

18 humiliation of a public trial."  The government does not believe

19 that these entirely self-inflicted wounds warrant a sentence

20 below the advisory guideline range.  Suspension or disbarment

21

22      [7]    Should the Court conclude that any of the guideline
23 adjustments requested by the government (economic gain,
   aggravating role, or abuse of trust) do not apply, the government
24 will argue for a greater upward departure to account for those
   additional aggravating factors and to reach a total offense level
25 of 19 and a 36-month sentence, which the government believes is
   the minimum term required to satisfy the goals of 18 U.S.C.
26 § 3553(a).

27      [8]    According to the PSR, defendant's equity in the five-
   bedroom, seven-bathroom residence is over $8.3 million.  (PSR
28 ¶¶ 57, 79).  The Los Angeles County Assessor's website
   (assessor.lacounty.gov) describes the property as an 8,557-
   square-foot residence.

                                21

1  from the State Bar is automatic upon a felony conviction

2  involving moral turpitude:  were that to constitute a mitigating

3  "collateral consequence," convicted attorneys would never go to

4  prison (or would, at a minimum, always serve reduced sentences).[9]

5  Nor should "the humiliation of a public trial" be any more of a

6  mitigating factor for this defendant than for an illegal reentry

7  defendant, a drug defendant, or any other individual who comes

8  before the Court.[10]  In this regard, the government asks the

9  Court to consider the following cogent analysis of another

10  district court that sentenced a 64-year-old rabbi to prison for

11  tax evasion, rejecting his claim that he should not be

12  incarcerated because he had been "punished enough":

> If punishment were wholly or mainly retributive,
> [public humiliation] might be a weighty factor.  In the
> end, however, it must be a matter of little or no
> force.  Defendant's notoriety should not in the last
> analysis serve to lighten, any more than it may be
> permitted to aggravate, his sentence.  The fact that he
> has been pilloried by journalists is essentially a
> consequence of the prestige and privileges he enjoyed
> before he was exposed as a wrongdoer.  The long fall
> from grace was possible only because of the height he
> had reached.  The suffering from loss of public esteem
> reflects a body of opinion that the esteem had been, in
> at least some measure, wrongly bestowed and enjoyed.
> It is not possible to justify the notion that this mode
> of nonjudicial punishment should be an occasion for
> lenience not given to a defendant who never basked in
> such an admiring light at all.  The quest for both the
> appearance and the substance of equal justice prompts
> the court to discount the thought that the public
> humiliation serves the function of imprisonment.

---

[9]    The government notes that all gainfully employed
criminals lose their ability to work while incarcerated, and many
lose licenses and are permanently barred from their chosen
professions.

[10]    Of course, defendant could have avoided "the
humiliation of a public trial" by admitting his conduct and
entering a guilty plea.  While defendant should not be penalized
for choosing to exercise his right to a public trial, neither
should he receive a sentencing benefit for it.

22

<u>United States v. Bergman</u>, 416 F. Supp. 496, 502-03 (S.D.N.Y.

1976).  With respect to the Probation Officer's consideration of

"collateral consequences," the government strongly disputes that

defendant should receive a benefit over other citizens who commit

the same crime simply by virtue of the fact that he led a life of

extreme privilege at the time he chose to become a criminal.

    The Probation Officer also relies in mitigation on a series

of letters submitted by defendant's colleagues and friends[11],

including retired United States District Judge Dickran Tevrizian,

whose opinion the Probation Officer "particularly note[s] because

of his experienced perspective in matters such as the instant

case."  Judge Tevrizian, however, writes not as a sentencing

judge familiar with the defendant's conduct, but in his capacity

as - as described in a separately submitted letter - defendant's

"best friend since high school."  (Letter of Edward and Reon

Roski).  Judge Tevrizian's letter does not suggest that he has

reviewed any of the recordings or other evidence in this case,

has evaluated any of the trial testimony, has read the victim

impact letters submitted by the government, has weighed

defendant's persistent and adamant refusal to accept

responsibility for his crimes, or has considered any of the other

matters that he would have taken into account at sentencing in

his former role as a district judge.  As such, the government

submits that Judge Tevrizian's "experienced perspective" plays no

---

[11]   The letters, although referenced as a basis for the
Probation Officer's recommendation, were not appended to the
presentence report, nor were they attached to defendant's
sentencing position.  After several requests, the government
received copies of the letters from the Probation Office on
October 30, 2008.  The government assumes that the Court has
received the letters as well.

1  role in his letter, and that that letter merits no greater weight
2  - and, understandably, reflects no less personal bias - than any
3  letter written by any other defendant's lifelong best friend.

4      The Probation Officer further relies on letters from 17
5  current and former partners, associates and employees of
6  defendant's law firm, which attest to defendant's ethics,
7  honesty, integrity, and high moral character.  The government
8  submits that those letters must be considered in light of the
9  inherent conflicts of interest and biases of the writers, who not
10  only owe their livelihood and financial security to defendant,
11  but also work for the firm that is defendant's lead defense
12  counsel in this case.  Moreover, the letters lack credibility in
13  that they paint a picture of a far different man than the one
14  before this Court, who unhesitatingly - and with great amusement
15  - violated state and federal law and the most fundamental canons
16  of legal ethics in order to win a case.  The government submits
17  that the letters, which fail to address the offense conduct
18  beyond the most superficial acknowledgment, simply cannot be
19  squared with the morally bankrupt nature of defendant's conduct,
20  and thus are entitled to little, if any, weight.[12]

21      Other factors cited by the Probation Officer in mitigation -
22  that defendant is a veteran, is married, and has four children,
23  one of whom is a minor - fail to distinguish defendant from
24  countless others who are routinely sentenced to guideline prison
25  terms.  Nor does the government believe that the advanced age and
26
27  _____
        [12]   The suggestion of one writer that defendant provide
28  community service by "telling his story to our new future
    attorneys" would be rather pointless, as defendant's story
    continues to be that he did absolutely nothing wrong.

                              24

1  poor health of defendant's parents, who live in a guest house on
2  his property, constitute mitigating factors when viewed against
3  the severity of defendant's criminal conduct.   When any person of
4  defendant's age who commits crimes is fortunate enough to have
5  parents still living, those parents are likely to be infirm and
6  in need of care.   Defendant was not a full-time caregiver prior
7  to his conviction, but rather "maintained a demanding schedule
8  with long hours, intense pressure at work, and extensive travel."
9  (PSR ¶ 62).   There is nothing sufficiently unusual about his
10 family circumstances to support a non-guideline sentence.   See
11 USSG § 5H1.6 ("[F]amily ties and responsibilities are not
12 ordinarily relevant in determining whether a departure may be
13 warranted."); see also United States v. Mondello, 927 F.2d 1463,
14 1468-70 (9th Cir. 1991) (pre-Booker, holding that family ties may
15 serve as basis for departure only in "extraordinary
16 circumstances").   Indeed, defendant is far better situated than
17 the average defendant in this regard, as he clearly has the
18 financial means to ensure that his parents are fully cared for
19 while he is in prison.

20      What the government finds most astonishing - and, frankly,
21 outrageous - about the Probation Officer's recommendation is that
22 it gives absolutely no weight to the disgraceful facts of
23 defendant's crimes[13], to the utter contempt that he showed for
24 the legal process he had sworn to uphold, to the devastating

25
_____
26      [13]   The presentence report's entire description of
   defendant's offense conduct, as brought out in a five-week trial,
27 consists of a single six-sentence paragraph.   (PSR ¶ 15).   In
   contrast, the section on defendant's "personal and family data"
28 runs over two pages and includes mention of his Kiwanis Club Boy
   of the Year award and his election as high school student body
   president in the 1950s.   (PSR ¶¶ 45-58).

                              25

impact on his victims, or to the need to deter others from engaging in similar conduct.  Instead, the Probation Officer focuses sympathetically on defendant's fully deserved "collateral consequences," and gives unquestioning (and somewhat star-struck) acceptance to the character reference letters without even attempting to reconcile them with defendant's offense conduct. In the end, the Probation Officer's recommendation sends a truly disturbing message:  that if a defendant is powerful and well-connected enough to get a former district judge or Secretary of State to write letters on his behalf, he can serve out his "punishment" with his family in the comfort of his Beverly Hills mansion, while the ordinary defendant who commits the same crime but lacks the same status in society (however ill-gotten) gets sent to federal prison.  The government submits that the Probation Officer's recommendation is reckless, uninformed, and completely inappropriate to the facts of this case.

IV.

RECOMMENDED SENTENCE

The government respectfully submits that defendant should be sentenced to a term of 36 months imprisonment, within the applicable guideline range of 30-37 months.  In addition, the statutory maximum fine of $500,000 should be imposed.  This sentence is the minimum sentence that is appropriate and reasonable in light of the statutory policy goals set forth in 18 U.S.C. § 3553(a).

A.   A 36-Month Sentence is Appropriate

The law provides that sentencing courts must start with the sentence advised by the Sentencing Guidelines.  United States v.

26

1  <u>Booker</u>, 543 U.S. 220, 264 (2005) ("The district courts, while not
2  bound to apply the Guidelines, must consult those Guidelines and
3  take them into account when sentencing."); <u>United States v.</u>
4  <u>Cantrell</u>, 433 F.3d 1269, 1279 (9th Cir. 2006) (stressing that
5  "district courts still must consult the Guidelines and take them
6  into account when sentencing, even though they now have the
7  discretion to impose non-Guidelines sentences").  Thus, the
8  "starting point" here in determining the appropriate sentence is
9  the advisory range of 30-37 months of incarceration.  <u>See</u>
10 <u>Cantrell</u>, 433 F.3d at 1280.

11      Pursuant to 18 U.S.C. § 3553(a), the court should "impose a
12 sentence sufficient, but not greater than necessary," to comply
13 with the enumerated purposes of sentencing, including "the nature
14 and circumstances of the offense," "the history and
15 characteristics of the defendant," and "the need for the sentence
16 imposed - (A) to reflect the seriousness of the offense, to
17 promote respect for the law, and to provide just punishment for
18 the offense; (B) to afford adequate deterrence to criminal
19 conduct; (C) to protect the public from further crimes of the
20 defendant; and (D) to provide the defendant with needed
21 educational or vocational training, medical care, or other
22 correctional treatment in the most effective manner."  18 U.S.C.
23 § 3553(a)(2).  The government submits that a guideline sentence
24 of 36 months is fully appropriate and consistent with the goals
25 of sentencing set forth in 18 U.S.C. § 3553(a), particularly the
26 need for specific and general deterrence and the need for the
27 sentence to reflect the seriousness of defendant's crimes, to
28 promote respect for the law, and to provide just punishment.

1.   <u>Nature and Circumstances of the Offense</u>

Defendant, a prominent attorney in the community, stands convicted of conspiring to wiretap and wiretapping the attorney-client privileged telephone conversations of an opposing party in litigation.   There is little more that the government can say about the reprehensible nature of defendant's conduct.

2.   <u>History And Characteristics Of The Defendant</u>

The presentence report makes clear that defendant had the benefit of every financial and educational advantage and opportunity that are unavailable to the great majority of defendants before this Court:  a "secure and stable" childhood, a keen intellect, a full tuition scholarship to Stanford, a University of Southern California law degree, and a highly lucrative legal career.   It is clear that defendant's crimes arose not from need or desperation, but from rational deliberation and calculated choice.

Although the letters submitted on defendant's behalf describe his high moral and ethical character, the government submits that the offense conduct in this case cannot rationally be viewed as aberrant.   One does not wake up one morning after nearly four decades of a wholly ethical legal career and decide to wiretap the opposing party's attorney-client conversations for a two-month period.   Defendant enjoyed and laughed about his criminal conduct and expressed no hesitation to engage in it: indeed, the only concern expressed by defendant throughout the 34 recordings is with the possibility of being exposed.   (<u>See, e.g.</u>, Exh. 1A at 2 ("[O]ne of the criteria is that no name ever surfaces anywhere.").   The government submits that the very

outrageousness of defendant's conduct itself suggests that, while
this is the first time that defendant got caught, it is highly
unlikely that it was an isolated departure from an otherwise law-
abiding life and practice.[14]

Defendant rejected numerous opportunities that he was
offered in this matter to cooperate with the investigation and
get himself back on the right side of the law, and he continues
even after the jury's verdict to refuse to accept responsibility
or express any regret for his actions.  Although the Probation
Officer received 46 letters of support for defendant, noticeably
absent is any letter or statement of remorse from defendant
himself.  Indeed, defendant's sentencing position vividly
demonstrates his ongoing refusal to display even a modicum of
character or rehabilitation, as it consists solely of further
attacks on his victim[15] and a defiant objection to the Probation
Officer's suggestion that defendant, through his counsel, had
accepted any responsibility for his crime.

While the government commends defendant for his charitable
donations (PSR ¶ 72), it believes that such acts in no way
mitigate or excuse his conduct in this case, which warrants a
severe punishment.

---

[14]    Indeed, shortly prior to making the decision to wiretap
Lisa Bonder Kerkorian, defendant had been referred to the State
Bar in the same case.  (7/24/08 (A.M.) RT 27-29).  Defendant not
only was undeterred by this referral, but immediately escalated
his conduct from ethical violations to full-blown criminal
activity.

[15]    Defendant and his counsel appear blind to the irony of
relying on findings by the judge in the Kerkorian matter, which
resulted at least in part from defendant's illegal conduct in
that case.

3. <u>Need For The Sentence to Reflect the Seriousness of the Offense, to Promote Respect For the Law, and to Provide Just Punishment For the Offense</u>

The government submits that its recommended sentence of 36 months imprisonment is required to reflect the seriousness of defendant's crimes, to promote respect for the law, and to provide just punishment. Defendant, who took an oath to uphold the law, engaged in a scheme to corrupt and subvert the legal system itself, to knowingly and repeatedly violate one of the most sacrosanct ethical tenets of his profession, and to victimize not only Lisa Bonder Kerkorian, but her attorneys, her friends, her family, and every other person who spoke over the compromised telephone lines between March and May 2002. Moreover, as the recordings make clear, defendant took unabashed delight in doing so. The seriousness of defendant's crimes simply cannot be overstated, and a significant sentence is required to reflect that fact, to promote respect for the law and its institutions, and to punish defendant for his outrageous conduct.

4. <u>Need For the Sentence to Afford Adequate Deterrence</u>

The need for the sentence imposed to afford general deterrence (and, in light of defendant's continued failure to accept any responsibility or express any remorse, specific deterrence) is strong. Distressingly, the evidence gathered during this investigation and presented at the two trials suggests that defendant was not the only attorney who knowingly used Pellicano's wiretapping services to gain an advantage in litigation. As Stephen Kolodny, one of defendant's victims, states in his letter to the Court:

30

As you know, Mr. Christensen was not Mr. Pellicano's only client.  I suffered similar conduct when the opposing side always seemed to know what I was doing in other cases I was handling with lawyers who were not indicted.  I hope the message that results from Mr. Christensen's sentence serves a clear and absolute warning to them of the peril they face if they ever engage in such conduct in the future.

You have an opportunity through whatever sentence you impose on Mr. Christensen, hopefully, to deter other lawyers who did, or are inclined to do, what Mr. Christensen was convicted of doing.  If the message from sentencing is "maybe the risk is worth taking, because the penalty is not too severe," then the opportunity to cause a decline in inappropriate conduct by those who have done it in the past, or are thinking about doing it in the future, is lost.

I urge you to impose the maximum sentence allowed by law upon Mr. Christensen and that he be required to serve his time incarcerated in a meaningful way, to punish him for the terrible wrongs that he has committed and the complete breach of morals and public trust that characterized him.

Letters from other victims of defendant in the legal community similarly urge this Court to consider the need for deterrence in imposing an appropriate sentence.  See Letter of Harlee Gasmer ("I believe that [defendant's] actions will no doubt cause the public to think less of the legal profession if he is given leniency.  Mr. Christensen's punishment should be as severe as permitted under law to stand as a deterrent to others from even considering engaging in similar criminal conduct."); Letter of Anetta Herringshaw ("I encourage you to consider the violation of the rights of all the victims in this case, when it comes to sentencing both defendants and use the full strength of the law to discourage any further illegal conduct of this type in a field that should be known for men and women whose ethics are beyond reproach."); Letter of Robert Rein ("To find that an attorney would stoop so low to obtain an advantage in litigation

31

perpetuates the stereotype in the eyes of the public of an
attorney who has no morals and would lie or cheat if it would
benefit him/her.  We must send a message that this behavior is
unacceptable."); Letter of Jeff Sturman ("I believe that a
relatively long prison sentence will deter others from engaging
in similar illegal acts and it will help to preserve respect for
the law and our system of justice.").

To the extent that conduct such as defendant's is in fact
not unique in the legal community, it will hardly be deterred by
sending the message that the consequence of such conduct is home
detention in a Beverly Hills mansion.  A substantial prison
sentence is required to deter other attorneys who, like
defendant, would misuse their sworn positions of trust and
violate the law in order to win a case.

5.   <u>Need For the Sentence to Protect the Public</u>

The government submits that a significant sentence is needed
to protect the public from further criminal conduct by defendant.
Despite having had several years to reflect on his offenses,
defendant refuses to express even the slightest remorse for his
corrupt violations of law, for the harm caused to his victims, or
for the embarrassment that he has caused to his firm and to the
legal profession as a whole.  Any claim that defendant has been
rehabilitated is belied by his continuing denials and utter
inability to take responsibility for his criminal acts.  Indeed,
defendant has given this Court no reason to believe that he would
hesitate to do precisely the same thing again if he thought he
could get away with it.  Thus, society's need for protection from
future criminal conduct is strong.

1    In sum, defendant used his law license and his position of

2 trust and power in the community as tools to commit felonies, and

3 he did so without hesitation and with no demonstrable regret.   He

4 caused substantial emotional and psychological harm to his

5 victims and showed scorn for the most basic principles of

6 fairness that he was sworn to uphold.   He is, in the government's

7 view, undeserving of leniency, and he should receive a sentence

8 that reflects appropriate condemnation of his conduct.   The

9 government respectfully asserts that a guideline sentence of 36

10 months incarceration is both reasonable and appropriate in this

11 case, and is sufficient, but not greater than necessary, to

12 achieve the goals of 18 U.S.C. § 3553(a).

13 B.   A $500,000 Fine Should Be Imposed

14    The Probation Officer has recommended a $15,000 fine on each

15 of the two counts of conviction, for a total of $30,000, the high

16 end of the advisory guideline range for an offense level of 12.

17 Because the government believes that the correct offense level,

18 as argued above is 19, the advisory fine range is $6,000 to

19 $60,000.   The government submits, however, that the statutory

20 maximum fine of $500,000 is appropriate and necessary in this

21 case.

22    The purpose of criminal fines is punitive, not remedial.

23 Schachter v. C.I.R., 255 F.3d 1031, 1034-35 (9th Cir. 2001).   As

24 such, "[t]he amount of the fine should always be sufficient to

25 ensure that the fine, taken together with other sanctions

26 imposed, is punitive."   USSG § 5E1.2(d).   Here, the $15,000 per

27 count fine recommended by the Probation Officer is, according to

28 defendant's presentence report, less than one month's mortgage

payment, less than one month's credit card payment, and less than one month's "not necessary" expenses (including such items as country club fees, housekeeping, pool maintenance, car washes, and salon services).  (PSR ¶ 82).  Accordingly, the guideline fine would serve no punitive purpose, as it would barely be felt by this defendant.  In addition, the recommended fine is no doubt a drop in the bucket compared to the legal fees that defendant received in the case in which he engaged in his illegal wiretapping, thereby resulting in a net financial gain to defendant.

In order to satisfy the punitive purpose of a criminal fine in light of defendant's net worth (see PSR ¶ 75), the statutory maximum fine of $500,000 ($250,000 per count) is warranted.  As the Probation Officer notes that defendant has sufficient cash available to make an immediate lump sum payment up to the maximum statutory amount (PSR ¶¶ 83-84), an order for immediate payment in full is requested.

//
//
//
//
//
//
//
//
//
//
//

34

V.

CONCLUSION

For all of the reasons stated above, the government respectfully requests that defendant be sentenced to a term of imprisonment of 36 months and a fine of $500,000.

DATE: November 10, 2008

Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

DANIEL A. SAUNDERS
KEVIN M. LALLY
Assistant United States Attorneys
Violent & Organized Crime Section

Attorneys for Plaintiff
United States of America

35

CERTIFICATE OF SERVICE

I, **SUSANA ZAMBRANO**, declare:

That I am a citizen of the United States and resident or employed in Los Angeles, County, California; that my business address is Office of United States Attorney, Federal Courthouse 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on **November 10, 2008**, a hand delivery copy of: **GOVERNMENT'S POSITION RE: SENTENCING FOR DEFENDANT TERRY CHRISTENSEN AND RESPONSE TO DEFENDANT'S SENTENCING POSITION**

**service was:**

[ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[ ] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[ X ] By hand delivery addressed as follows:

[ ] By facsimile as follows:

[ ] By messenger as follows:

[ ] By federal express as follows:

Kathryn Herrera
Eduardo Cervantes
U.S. Probation Office
312 N. Spring Street, 6th Floor
Los Angeles, CA 90012

at **their** last known address, at which place there is a delivery service by hand.

This Certificate is executed on **November 10, 2008**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

_____
(Legal Assistant) Susana Zambrano